# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Assad Awaijane, Robert Awaijane, Anisse Campbell, Darius Campbell, Wayne Green, and Merrick Jackson, | Case No. **Complaint** |
| Plaintiffs, | Jury Trial Demanded Fed. R. Civ. P. 38(b) |
| v. | |
| Andrew Bittell, acting in his individual capacity as a Minneapolis Police Officer; Michael Osbeck, Jr., acting in his individual capacity as a Minneapolis Police Officer; Christopher Cushenbery, acting in his individual capacity as a Minneapolis Police Officer; Justin Stetson, acting in his individual capacity as a Minneapolis Police Officer; Kristopher Dauble, acting in his individual capacity as a Minneapolis Police Officer; Nathan Sundberg, acting in his individual capacity as a Minneapolis Police Officer; Mark Ringgenberg, acting in his individual capacity as a Minneapolis Police Officer; Xavier Rucker, acting in his individual capacity as a Minneapolis Police Officer; Matthew Severance, acting in his individual capacity as a Minneapolis Police Officer; Ronald Stenerson, acting in his individual capacity as a Minneapolis Police Officer; Johnny Mercil, acting in his individual capacity as a Minneapolis Police Officer; John Does 1-10, acting in their individual capacities as Minneapolis Police Officers; and the City of Minneapolis, | |
| Defendants. | |

1

For their Complaint, Plaintiffs Assad Awaijane, Robert Awaijane, Anisse Campbell, Darius Campbell, Wayne Green ("Green"), and Merrick Jackson ("Jackson") state and allege as follows:

## INTRODUCTION

1.     On May 30, 2020, the City of Minneapolis was in a state of civil unrest following the murder of George Floyd by Minneapolis police officers. The plaintiffs were family and friends of the owner of a gas station in Minneapolis. On a previous evening, the gas station was broken into and looted. During this time, the Minneapolis police were unable to maintain civil control and prevent damage and theft from businesses.

2.     The plaintiffs and others maintained a presence at the gas station on May 30, 2020 to protect it from further harm. They watched the area for issues. They also barbequed, had food, and socialized. A crew of journalists were also at the gas station covering plaintiffs and others protecting the gas station.

3.     That evening, the situation was calmer than previous days. One group of law enforcement, believed to be Minnesota State Trooper and National Guard members, asked the plaintiffs what they were doing at the gas station. The plaintiffs explained that they were protecting the gas station. Those officers let the plaintiffs be.

4.     Shortly after that encounter, the plaintiffs came under sudden attack. First, they heard what sounded like gunshots, and multiple plaintiffs were struck with projectiles. Many plaintiffs thought that they were under lethal attack. The plaintiffs then learned that the attackers were members of the Minneapolis police department. Officers had attacked

with less-lethal 40mm rounds without warning or notice. Other officers came onto the gas station premises.

5.      The plaintiffs tried to surrender and explain that they were protecting the property. Despite their efforts, officers continued to seize the plaintiffs and subject them to force, including chemical spray. Officers also dispersed the journalists and used pepper spray against a journalist who had surrendered.

6.      The encounter and attack left the plaintiffs physically, mentally, and emotionally injured. The attack demonstrated to the plaintiffs that the people who were supposed to protect them, Minneapolis police officers, could, instead, be malicious attackers.

7.      Review of the officers' conduct surrounding this attack revealed a malicious operation to hunt and harm civilians that evening. Officers engaged in racial profiling, discussed "hunting" protesters, admitted that they enjoyed using force against civilians, and engaged in surprise attacks to prevent civilians from taking defensive measures. After the incident, officers gave false statements about their conduct, and the Minneapolis police department failed to investigate or hold many of the officers involved accountable, despite publicly-available information about the misconduct.

8.      Investigations of the Minneapolis police department by government agencies during and following this incident have revealed long-running patterns of constitutional violations with a system that fails to deter misconduct or punish those who commit it.

9.      On May 30, 2020, the plaintiffs tried to protect a business and expected that Minneapolis police officers would aid in their efforts to keep the plaintiffs and the business

3

safe. Instead, Minneapolis police officers maliciously attacked the plaintiffs for personal enjoyment. The plaintiffs are left with fear, anxiety, and a lack of trust as a result. The plaintiffs bring this action to vindicate their constitutional rights that were violated by the defendants on May 30, 2020.

## PARTIES AND VENUE

10.    Plaintiff Assad Awaijane is a citizen of Minnesota. Assad Awaijane was present at a gas station on May 30, 2020 when he was attacked and subjected to improper force by Minneapolis Police Department ("MPD") officers.

11.    Plaintiff Robert Awaijane is a citizen of Minnesota. Robert Awaijane was present at a gas station on May 30, 2020 when he was attacked and subjected to improper force by MPD officers.

12.    Plaintiff Anisse Campbell is currently a citizen of Florida. Campbell was present at a gas station on May 30, 2020 when she was attacked and subjected to improper force by MPD officers.

13.    Plaintiff Darius Campbell is a citizen of Minnesota. Darius Campbell was present at a gas station on May 30, 2020 when he was attacked and subjected to improper force by MPD officers.

14.    Plaintiff Wayne Green is a citizen of Minnesota. Green was present at a gas station on May 30, 2020 when he was attacked and subjected to improper force by MPD officers.

15. Plaintiff Merrick Jackson is a citizen of Minnesota. Jackson was present at a gas station on May 30, 2020 when he was attacked and subjected to improper force by MPD officers.

16. Defendant Andrew Bittell ("Bittell") is, upon information and belief, a citizen of Minnesota. Bittell served as an officer in the MPD on May 30, 2020. Bittell supervised Unit 1281 on May 30, 2020. Bittell acted under color of state law at all material times. He is sued in his individual capacity.

17. Defendant Michael Osbeck, Jr. ("Osbeck") is, upon information and belief, a citizen of Minnesota. Osbeck served as an officer in the MPD on May 30, 2020. Osbeck acted under color of state law at all material times. He is sued in his individual capacity.

18. Defendant Christopher Cushenbery ("Cushenbery") is, upon information and belief, a citizen of Minnesota. Cushenbery served as an officer in the MPD on May 30, 2020. Cushenbery acted under color of state law at all material times. He is sued in his individual capacity.

19. Defendant Justin Stetson ("Stetson") is, upon information and belief, a citizen of Minnesota. Stetson served as an officer in the MPD on May 30, 2020. Stetson acted under color of state law at all material times. He is sued in his individual capacity.

20. Defendant Kristopher Dauble ("Dauble") is, upon information and belief, a citizen of Minnesota. Dauble served as an officer in the MPD on May 30, 2020. Dauble acted under color of state law at all material times. He is sued in his individual capacity.

5

21.     Defendant Nathan Sundberg ("Sundberg") is, upon information and belief, a citizen of Minnesota. Sundberg served as an officer in the MPD on May 30, 2020. Sundberg acted under color of state law at all material times. He is sued in his individual capacity.

22.     Defendant Mark Ringgenberg ("Ringgenberg") is, upon information and belief, a citizen of Minnesota. Ringgenberg served as an officer in the MPD on May 30, 2020. Ringgenberg acted under color of state law at all material times. He is sued in his individual capacity.

23.     Defendant Xavier Rucker ("Rucker") is, upon information and belief, a citizen of Minnesota. Rucker served as an officer in the MPD on May 30, 2020. Rucker acted under color of state law at all material times. He is sued in his individual capacity.

24.     Defendant Matthew Severance ("Severance") is, upon information and belief, a citizen of Minnesota. Severance served as an officer in the MPD on May 30, 2020. Severance acted as a supervisor on May 30, 2020. Severance acted under color of state law at all material times. He is sued in his individual capacity.

25.     Defendant Ronald Stenerson ("Stenerson") is, upon information and belief, a citizen of Minnesota. Stenerson served as an officer in the MPD on May 30, 2020. Stenerson acted under color of state law at all material times. He is sued in his individual capacity.

26.     Defendant Johnny Mercil ("Mercil") is, upon information and belief, a citizen of Minnesota. Mercil served as an officer in the MPD on May 30, 2020. Mercil acted as a supervisor on May 30, 2020. Mercil acted under color of state law at all material times. He is sued in his individual capacity.

6

27.    Defendants John Does 1-10 are, upon information and belief, unidentified individuals who were employed as officers in the MPD on May 30, 2020 and acted under color of state law at all material times. They are sued in their individual capacities.

28.    Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota and is a citizen of Minnesota. The MPD is an agency of the City of Minneapolis.

## JURISDICTION

29.    The plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3). These statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

30.    The events giving rise to this action occurred in Minneapolis, Minnesota. Venue is proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A. Minneapolis Police Operations on May 30, 2020

31.    On May 25, 2020, George Floyd was murdered during an arrest by MPD officer Derek Chauvin and three other MPD officers.

32.    Widespread protests occurred in response to the murder of Floyd in Minneapolis and around the country.

33.    The following days, the MPD was unable to maintain control of Minneapolis. Looters, arsonists, and others were able to commit widespread criminal acts that injured others and caused harm to area businesses.

34.   On May 30, 2020, Minneapolis was calmer than on previous days. Despite the calm, MPD officers engaged in aggressive operations that involved the use of force toward civilians, often by surprise and in an indiscriminate manner. Rather than promote safety and protection, these tactics caused unnecessary fear, pain, and trauma upon civilians.

35.   MPD Unit 1281 was a SWAT unit that operated that evening. Sgt. Bittell supervised the team. Officer Osbeck drove the unit's unmarked white van, which had concealed squad lights and no law enforcement markings. Officers Cushenbery, Stetson, and Dauble used 40mm less-lethal weaponry. Officers Sundberg, Ringgenberg, and Rucker were also part of the unit.

36.   Unit 1281 worked as a CART team, which provided less-lethal and other support for other units.

37.   Unit 1281 officers demonstrated malicious enjoyment about using force against civilians in an indiscriminate manner.

38.   One officer joked, using an Elmer Fudd-type voice, that they were hunting activists.

39.   MPD officers disparaged scared civilians, with one calling such civilians "pusses" for fleeing from officers. Bittell responded that officers should shoot the fleeing civilians with 40mm rounds.

40.   Other officers described sneaking up on civilians and using force before the civilians understood or could respond to the use of force.

41.     Officers prioritized using force against civilians, even when it was unnecessary or contrary to legitimate law-enforcement purposes. Officers deliberately failed to issue warnings or give civilians an opportunity to avoid force being used against them.

42.     During one encounter, Bittell directed his team to refrain from action to draw approaching civilians closer so that 40mm rounds could suddenly be fired against the civilians.

43.     Officers admitted that they enjoyed using force against civilians that evening.

44.     Officers in Unit 1281 joked that their 40mm rounds were "very effective" against civilians. Officers repeated this line throughout the evening as they shot less-lethal rounds at civilians.

45.     On May 30, 2020, MPD officers repeatedly shot 40mm rounds and used force against civilians in a manner that violated department policy and constitutional restrictions on use of force.

46.     In one instance, Stetson attacked a protester who had surrendered and put their hands above their head. Stetson struck the protester in the head with his 40mm launcher to take him to the ground.

47.     Stetson also shot 40mm rounds at departing protesters. After striking a distant protester with a 40mm round, Stetson taunted them while other members of Unit 1281 congratulated Stetson on the distant shot. Dauble gave Stetson a fist bump.

48.     The 40mm less-lethal rounds are not non-lethal. They can cause grievous injury or even death when used in certain circumstances. MPD policy directs that the rounds should not be directed toward critical parts of a target's body.

49.     MPD policy also directs that 40mm rounds can be confused with live ammunition. Officers are directed to take measures to avoid confusion between the use of 40mm rounds and live ammunition.

50.     Officers failed to follow these policies for 40mm-round use on May 30, 2020.

51.     On May 30, 2020, MPD use-of-force policy permitted officers to use unconstitutional force toward civilians.

52.     SWAT officers were able to use 40mm rounds in circumstances where no safety threat existed, such as to protect against or in response to suspected property damage.

53.     The MPD did not enforce use-of-force recordkeeping, review, and accountability policies to prevent unconstitutional use of force by officers.

54.     Many civilians suffered significant injuries due to officers' 40mm-round use, including loss of eyes and head injuries during the George Floyd protests.

55.     On May 30, 2020, MPD officers engaged in racial profiling in which they falsely accused non-white civilians of being involved in criminal activity.

56.     Lt. Mercil was the MPD use-of-force training supervisor on May 30, 2020.

57.     Mercil acted as a supervisor of Unit 1281 and other assembled officers near a group of protesters on Lake St.

10

58.    At that location, Mercil expressed contempt for journalists covering the protests and disagreed with public officials' claims that white supremacists and other out-of-state actors were causing violence.

59.    Mercil commented that a group of protesters near the officers must be "predominantly white." He made that assumption because there was "not looting and fires," suggesting that looting and fires were primarily caused by non-white persons.

60.    Osbeck stated that he agreed with Mercil and noted that the five or six people that Osbeck had encountered were white and from Minneapolis.

61.    That evening, Mercil encouraged MPD officers to use force against civilians, including journalists. He also encouraged MPD officers to engage in racial profiling to target and accuse non-white civilians of looting and arson.

62.    Later, in the incident involving the plaintiffs, MPD officers would both use force against a journalist and falsely claim that non-white persons were engaged in suspected criminal activity, consistent with Mercil's encouragement.

63.    Later in the evening, Unit 1281 met other MPD officers near Hiawatha Ave. and E. Lake St. in Minneapolis.

64.    At that location, Severance served as a supervisor and directed other officers to patrol down Lake St. and use force against civilians. He told others, "you see a f***ing group, call it out, ok great, f*** 'em up. Gas 'em, f*** 'em up."

65.    Acting on this direction, officers would later use force against the plaintiffs, who were assembled in a group to protect the gas station.

11

66.     Bittell took Severance's order and directed Unit 1281 to proceed down Lake St. and shoot civilians with 40mm rounds. Bittell met Unit 1281 officers by their van. Bittell told his team: "We're rolling down Lake St. The first f***ers we see, we're just handling them with 40[mm rounds]." Bittell asked his team if that was a "good copy." Unit 1281 officers responded with laughter and enthusiasm.

67.     Before heading down Lake St., Unit 1281 officers loaded into the unmarked van. Sgt. Bittell sat in the front passenger seat. The driver, Officer Osbeck, asked Sgt. Bittell, "What are we doing with these people on Lake St.?" Sgt. Bittell responded, "Shooting them with 40[mm rounds]." After Sgt. Bittell's comment, an officer in the van laughed.

### B.  Minneapolis Police Officers attack the Plaintiffs

68.     Unit 1281 led a caravan of marked squads down Lake St. toward the gas station where the plaintiffs were assembled. Unit 1281 drove without emergency lights activated on the unmarked van.

69.     Without emergency lights active, the van looked like a civilian van. There was no light bar or markings indicating that it was a law enforcement vehicle.

70.     Bittell directed other squad cars to have no lights or sirens. He said the operation was "like a slow jog in the park finding people."

71.     This directive was consistent with officers' efforts to sneak up on unsuspecting civilians to shoot them with 40mm rounds before the civilians could respond or avoid the attack.

72.    While driving, a Unit 1281 officer asked Bittell to "get the [marked squad cars] to slow down and stay behind us so we can use the [40mm launchers]." Bittell told other cars to slow down and stay behind the van.

73.    This request was also consistent with an attempt to set up a surprise attack on unsuspecting civilians.

74.    While moving down Lake St., Unit 1281 and the other squads came upon the Stop N Shop gas station, near 18th Ave. and E. Lake St.

75.    Officers saw the plaintiffs and others standing near the gas station and in the parking lot.

76.    Osbeck and Bittell called out the plaintiffs and others at the gas station.

77.    Bittell ordered Osbeck to speed the van up so that officers in the back of the van could shoot less-lethal rounds out the rear passenger door before the plaintiffs and others could understand or respond to being shot at.

78.    Osbeck accelerated toward the gas station.

79.    At that time, the plaintiffs and others were at the gas station to protect the business.

### C. The Plaintiffs are attacked while protecting a Business

80.    In the previous days, the Stop N Shop gas station had been looted, and law enforcement was not able to secure the area or protect the business.

81.    The plaintiffs include the owner of the Stop N Shop's family and friends who agreed to stay on site on May 30 to protect the gas station and surrounding area from further criminal activity.

13

82. A group of journalists were with the plaintiffs that evening, documenting the plaintiffs' efforts to protect the area.

83. That evening was generally calm. The plaintiffs and others grilled food, socialized, and monitored the area to ensure no criminal behavior occurred.

84. Later in the evening, a group of law-enforcement officers, believed to be State Troopers and National Guard came past the gas station.

85. Assad Awaijane spoke with those officers and explained that he and others were present to protect the business. The officers let them be and moved on.

86. The plaintiffs continued monitoring the area. The area remained calm.

87. Suddenly, without warning, the plaintiffs heard shots and feared that they were under attack.

88. Many of the plaintiffs believed that they were being shot at with live ammunition.

89. Initially, the plaintiffs did not who was attacking or why they were being shot.

90. The plaintiffs feared for their lives and experienced extreme terror and fear. Many plaintiffs thought that they were facing a lethal treat and could be killed.

91. While trying to flee the shots, Darius Campbell was shot in the back.

92. He thought he had been hit by a bullet and was going to die.

93. He fled into the gas station.

94. Campbell later learned that he had been shot with a less-lethal round, not live ammunition.

95.    Minneapolis police officers fired multiple less-lethal rounds at the plaintiffs without warning.

96.    Wayne Green was shot in the shoulder by a less-lethal round.

97.    Assad Awaijane was struck by a projectile on his backside.

98.    Anisse Campbell was targeted by less-lethal rounds and tried to escape the attack. An officer pointed a weapon that appeared to be a lethal firearm at her, threatening additional use of force.

99.    Near the gas pumps, Robert Awaijane lied flat on the ground as officers came to the gas station. He lifted his head to explain that he was there to protect the property. An officer sprayed chemical spray on Robert Awaijane, causing him extreme pain.

100.    Merrick Jackson was near Robert Awaijane at that time. Jackson submitted to officers by going toward the ground.

101.    An officer used a large amount of chemical spray on Jackson, causing him substantial pain.

102.    An officer also used chemical spray on a journalist who was lying on the ground and who repeatedly identified himself as press.

103.    Officers ordered the plaintiffs and others into the gas station.

104.    Officers then left the gas station, continuing down Lake St.

105.    Officers appeared to be laughing as they left. Officers appeared to taunt the plaintiffs and others gathered at the gas station.

106.    The plaintiffs experienced an extremely traumatic incident, and many suffered pain during and after the incident.

15

107. Many of the plaintiffs did not know who was initially attacking them or why shots were being fired in their direction. Many feared for their lives as they fled the sudden attack.

108. When the plaintiffs learned that the attackers were officers, they felt fear and anger. The plaintiffs did not understand why they had been attacked when the gas station was calm and they were protecting it from further harm.

109. Merrick Jackson felt significant pain from the chemical spray, causing him to scream when it happened.

110. Jackson said that the chemical spray felt like "pouring lava" across his face and eyes. When he was sprayed, he went into a panic and could not breathe or see.

111. He had a panic attack and was unable to calm down for more than an hour after the incident.

112. Others at the gas station tried to assist him by pouring milk on him and giving him eye drops.

113. He continued to experience pain and physical effects from the chemical spray for three days.

114. Due to the trauma, he continued to experience large amounts of stress and had trouble sleeping.

115. He is now unable to comfortably be around loud noises, such as fireworks. He also has a sense of apprehension around police officers.

116. Before the incident, he had a friendly relationship with many officers who came to the gas station. Following the incident, he has anxiety whenever officers direct their attention to him.

117. Robert Awaijane experienced pain due to the chemical spray.

118. Robert Awaijane's face felt like it was burning, and he was initially blinded. Excruciating pain continued until the next day.

119. He continued to be in shock for the next day, as well.

120. Following the incident, he has experienced increased stress and has recurring thoughts of the incident. He has a greater fear for his personal safety. He tries to avoid going to Minneapolis unless necessary.

121. Others around him have commented that his behavior and mental state have been affected by the incident.

122. He had a friendly relationship with police officers before the incident. However, the trauma of the incident has left him with a greater general distrust of law-enforcement officers.

123. Wayne Green was struck by a less-lethal round in his shoulder. He experienced substantial pain, and it left a bruise for a while.

124. Following the incident, he had trouble sleeping and avoided the Lake St. area.

125. Before the incident, he was friendly toward officers and thankful for their service. Following the incident, he is nervous around officers and unable to fully trust them. He no longer feels safe around officers.

126. Darius Campbell was shot in the back with a less-lethal round.

127. Since he was struck, he has had continuing back problems. His back still tightens up occasionally.

128. Following the incident, he has noticed symptoms consistent with PTSD. He finds that loud noises cause him to jump and experience anxiety and fear.

129. He chooses to be more sheltered following the incident so that he does not again find himself in a similar situation.

130. Anisse Campbell experienced extreme fear due to the officers' shots fired toward her and an officer holding her at gunpoint.

131. The incident was traumatic and negatively affected her.

132. Assad Awaijane experienced physical pain due to the attack of the officers.

133. He also saw officers attacking his family and friends.

134. He was left in a state of shock following the incident.

135. Following the incident, he has continued to experience significant mental trauma.

136. In his past, he has been evacuated twice from warzones.

137. He felt that the incident involving these officers was more terrifying than his previous evacuations.

### D. Officers Engaged in a Malicious Attack

138. Recordings from the officers show that the attack on the gas station was deliberate and malicious.

139. After speeding up to quickly come upon the people at the gas station, officers in the back of the Unit 1281 van immediately fired less-lethal rounds toward the plaintiffs and others at the gas station.

140. Officers fired without announcing that they were law enforcement and without warning that force was going to be used.

141. Officers in the back of the van fired multiple shots as the plaintiffs and others took cover and tried to find protection from the attack.

142. Upon information and belief, the officers shooting 40mm rounds included Cushenbery, Stetson, and Dauble.

143. Other officers in the Unit 1281 van heard the orders to attack civilians, heard Bittell's command to fire at the people protecting the gas station, and saw other officers in the van firing less-lethal rounds toward the plaintiffs and others. The other officers in the van failed to intervene to stop the improper use of force or to protect the victims of the attack.

144. Upon information and belief, the officers in the back of the van included Ringgenberg, Sundberg, and Rucker.

145. When Unit 1281 officers dismounted, Osbeck sought to puncture the tires of cars parked at the gas station.

146. Earlier in the evening, Bittell had punctured multiple vehicles' tires that were merely parked by police operations.

147. Bittell told Osbeck not to puncture the tires of vehicles at the gas station, however.

148. Officers in other squad cars dismounted at the gas station.

149. Some officers used additional force against the plaintiffs and others.

150. There was a group of journalists with the plaintiffs at the gas station. The journalists were covering how the plaintiffs were protecting the business.

151. When officers came upon the gas station, one journalist submitted to officers and lied on the ground with hands above his head. He explained that he was press and showed his credentials.

152. Stenerson used pepper spray on the journalist despite his submission to officers. Stenerson also observed other officers using improper force against the plaintiffs and failed to intervene.

153. An officer, John Doe 1, used chemical spray against two plaintiffs after they had submitted to officers.

154. Other officers, John Does 2-5, used force against the plaintiffs or engaged in improper seizures, such as raising firearms toward the plaintiffs and directing them to enter the gas station under threat of force.

155. Ringgenberg ordered journalists to disperse from the area, despite journalists being exempted from the curfew.

156. Other officers, including John Does 6-10, observed improper use of force at the gas station. These officers failed to intervene and prevent the unlawful activities by other officers.

157. After using force upon the plaintiffs and others, officers left the area and proceeded down Lake St.

### E. Officers engaged in a Pattern of Malicious Attacks and Unconstitutional Conduct

158. A few minutes after the gas station encounter, Unit 1281 came upon Jaleel Stallings and a group of others in a parking lot.

159. As with the encounter at the gas station, Unit 1281 officers immediately fired 40mm rounds toward Stallings and others in the parking lot without announcing that they were law enforcement or warning that force would be used.

160. Stallings, fearing that he was under lethal attack, fired a handgun that he was holding toward the van in self-defense.

161. When officers stopped and dismounted the van, Stallings recognized that they were law enforcement, and he immediately disarmed and lied flat on the ground to submit to officers.

162. Despite his submission, Stetson and Bittell beat Stallings for approximately thirty seconds, fracturing Stallings' eye socket.

163. Upon information and belief, officers who were involved in misconduct at the gas station, toward Stallings, and other such incidents that were recorded on video were not disciplined or held accountable for their actions in a timely or effective manner.

164. This failure to report, investigate, or enforce accountability toward officers who engaged in misconduct was widespread and well-known within the MPD and to City leaders. Many public statements and reports were issued criticizing the MPD's failure to effectively deter and punish such misconduct.

165. This ineffective accountability system contributed to the defendants committing brazen acts of misconduct in the view of their colleagues and the public while being recorded on body-worn cameras.

166. Following the encounter, Stallings was prosecuted for attempted murder of Unit 1281 officers.

167. Stallings was ultimately acquitted of all charges after a jury trial in which he claimed self-defense against the surprise attack by Unit 1281.

168. After Stallings was acquitted, materials involving the officers' conduct against Stallings and the plaintiffs at the gas station became public. The release of these materials caused significant public shock and outrage.

169. Upon information and belief, it was only after this public outrage that corrective and accountability measures began at the MPD. For more than a year, these efforts had not occurred despite recordings documenting the misconduct, publicly-available videos and accounts describing the misconduct, and knowledge of supervising officers, attorneys, and MPD decisionmakers that such misconduct had occurred and was widespread.

170. After the acquittal of Stallings and public outrage, the Hennepin County Attorney, Mike Freeman, who led the office that handled the prosecution, explained that Unit 1281 officers had "lied" to prosecutors.

171. More than two years after the incident, Stetson was charged with felony assault against Stallings, despite video of evidence of the assault having been available near the time of the incident itself.

172. Stetson admitted at a plea hearing that he used unreasonable force against Stallings, which contradicted his and other officers' reports of the incident.

173. Stetson himself has recognized the substantial harm and injury his actions caused on May 30, 2020. In a letter submitted in connection with his guilty plea, Stetson apologized for his "serious crimes." Stetson acknowledged the significant harm his unauthorized force caused: not only physical injury but also "emotional scars of the brutality [that] are equally as painful and can last forever." Stetson recognized he created a "problem" that "reflects a deeper, historical and institutional problem with the Minneapolis police and how some officers have responded poorly to the urban communities." Stetson recognized that there was a "lack of trust in police especially on the part of nonwhites" due to interactions with "particular officers, like [himself]." Stetson concluded by acknowledging and apologizing for the "role that MPD has played in society's historical mistreatment of the disadvantaged communities and against those engaged in peaceful civil protests."

174. The harms recognized by Stetson are of the same type as those suffered by the plaintiffs.

175. Despite personally observing, investigating, and reviewing reports of incidents involving improper conduct by other MPD officers, fellow MPD officers failed to timely report improper conduct.

176. Other officers' failure to report misconduct was widespread and well-known within the MPD.

177. The widespread pattern of officers failing to report misconduct of other officers contributed to the constitutional violations suffered by the plaintiffs. The defendants acted without any fear or concern that they would be reported despite engaging in misconduct in view of fellow MPD officers. Other MPD officers also failed to intervene to avoid revealing the misconduct caused by the defendants.

178. Following the MPD response to the George Floyd protests, government agencies conducted investigations of the MPD.

179. On April 27, 2022, the Minnesota Department of Human Rights ("MDHR") issued findings after conducting a review of MPD practices and policies.

180. MDHR found that "MPD officers use disproportionately, higher rates of more severe force against Black individuals […] even when comparing MPD officers' use of force against Black and white individuals in similar circumstances."

181. MDHR found that MPD officers used chemical irritants inappropriately in 37.1% of all incidents in which they were used. MDHR also found that officers used chemical irritants against Black individuals at a higher rate than white individuals.

182. MDHR found that MPD officers regularly failed to properly report use of force and were not held accountable when improper use of force was used or when officers' reports contradicted what was depicted on recordings.

183. MDHR found that MPD had a pervasive culture of racism and misogyny that was observable through recordings and other records held by the MPD. MDHR reported that other officers fail to report violations "because they do not believe in the efficacy of

the City's and MPD's accountability systems and fear retaliation if they report the harassing behavior."

184.   HCAO prosecutors reported that MPD officers' recordings were "difficult to rely on" "because of how disrespectful and offensive MPD officers are to criminal suspects, witnesses, and bystanders."

185.   MDHR found that MPD's trainings "reinforce a culture that exacerbates a pattern of race-based policing."

186.   MDHR found that MPD officers are trained not to question trainers or veteran officers, resulting in officers being "unwilling to intervene or report unauthorized force." MDHR found evidence that officers who reported such conduct were "retaliated against and ostracized."

187.   MDHR found that "MPD leaders do not hold supervisors accountable for their inadequate review of officers' use of force."

188.   MDHR found that "MPD's insufficient training contributes to MPD officers using unnecessary and inappropriate levels of force against individuals of all racial backgrounds." Between 2010 and 2020, MDHR found that MPD officers used unnecessary and inappropriate levels of force in nearly one-quarter of all incidents involving force.

189.   MDHR found that other officers failed to intervene in nearly three-quarters of incidents involving improper use of force.

190.   MDHR found that the accountability system of the MPD failed to prevent improper conduct and hold wrongdoers accountable at all levels. MDHR found that officer

25

failed to report incidents, investigators failed to conduct adequate investigations, and sufficient consequences were not always imposed.

191. MDHR found that the City of Minneapolis failed to adequately record and produce *Brady* materials for officers who commit misconduct and use coaching to shield others from learning of officer misconduct.

192. The MDHR's findings were based on review of materials held by the MPD. The findings were based on multiple incidents supporting each conclusion based on incidents spanning a decade.

193. MDHR found that these concerns were known to "MPD leaders [who] do not sufficiently act upon [the concerns]." In fact, MDHR found that leaders tried to be deliberately ignorant of officers' misconduct to avoid confronting the consequences of the improper activities.

194. The circumstances reported by the MDHR contributed to and were consistent with the misconduct that officers engaged in against the plaintiffs.

195. On June 16, 2023, the United States Department of Justice ("DOJ") published a report following its investigation of the Minneapolis Police Department.

196. The DOJ also found patterns and custom of conduct that violated constitutional rights.

197. The DOJ found that "MPD officers routinely use excessive force, often when no force is necessary." The DOJ's review of MPD incidents "revealed that MPD officers often use chemical irritants without justification." MPD officers "use chemical irritants on

people in an unreasonable and retaliatory manner that violates the Fourth and First Amendments."

198. The DOJ found a "pattern of MPD officers failing to intervene to prevent unreasonable force." Multiple specific examples of these violations are cited by the DOJ. Despite the violations, the DOJ found that there was "little accountability."

199. The DOJ found that MPD supervisors fail to adequately review use of force, which contributes to officers using excessive force. The DOJ determined that inadequate training may be a contributing factor to this inadequate review.

200. The DOJ, like MDHR, found that MPD officers engaged in patterns of race-based and discriminatory policing and use of force. The DOJ cited specific examples of racist culture present in the MPD.

201. The incident at the gas station here was cited as an example of a pattern by MPD officers of retaliating against journalists and unlawfully restricting their access during protests.

202. The DOJ found that the MPD's poor accountability system contributed to constitutional violations.

203. The DOJ found that MPD's training failed to prevent excessive force violations.

204. The DOJ found that MPD fails to adequately supervise its officers to prevent constitutional violations.

205. The DOJ findings were made based on evidence from MPD sources, which were available to MPD leadership.

206. The DOJ findings, like the MDHR findings, contributed to and were consistent with the officers' misconduct against the plaintiffs.

207. In addition to the MDHR and DOJ findings, many of these issues and patterns of improper conduct have been regularly and widely reported. MPD and City leaders have commented on these incidents and expressed that these activities should not continue. Despite the condemnation, however, the findings show continuous and pervasive customs and systemic failings that contribute to the constitutional violations suffered by the plaintiffs here.

208. The MDHR and DOJ findings, along with public reports, were pervasive and widespread. The findings include comments that the issues were widely known by officers, attorneys, and leadership. The misconduct was documented in materials that were readily available and should have been reviewed by leadership.

209. The defendant officers demonstrated inadequate training to prevent constitutional violations from occurring or encouraging other officers to intervene.

210. The defendants showed no concern with accountability or other officers reporting their misconduct. In fact, much misconduct went unreported and few, if any, officers involved in the incident here faced accountability from the MPD in a timely and effective manner.

211. The defendants targeted non-white individuals with improper force and made false claims of suspected criminal activity about them.

212. The defendants used force toward the journalists who were near the plaintiffs, and it is plausible that officers used force against the plaintiffs in part because they were talking to and harboring journalists.

213. The plaintiffs include non-white and Black individuals.

214. The plaintiffs were targeted, subjected to force, and falsely accused of being engaged in criminal activity because they are non-white or were associated with non-white individuals.

## CAUSES OF ACTION

### Count 1 – 42 U.S.C. § 1983 – Fourth Amendment Violations
### Involving Unlawful Seizure and Excessive Force

215. The plaintiffs reallege all allegations of this Complaint as if fully stated herein.

216. The defendants acted under color of state law while performing the acts described herein.

217. The defendants deprived the plaintiffs' Fourth and Fourteenth Amendment rights through the actions described herein.

218. Mercil encouraged the use of force toward journalists, including those near journalists, which included the plaintiffs.

219. Mercil encouraged falsely justifying and improperly using force against non-white individuals, which included the plaintiffs.

220. Severance and Bittell ordered officers to use excessive force against civilians that included the plaintiffs.

29

221. Osbeck and Bittell directed officers to use force against the plaintiffs.

222. Cushenbery, Stetson, and Dauble fired 40mm rounds at the plaintiffs.

223. Sundberg, Ringgenberg, and Rucker observed improper use of force toward the plaintiffs and failed to intervene.

224. John Doe 1 improperly used chemical irritant on some of the plaintiffs.

225. Stenerson participated in the operation to use improper force by using chemical irritant against a nearby journalist. He also observed improper force by other officers and failed to intervene.

226. John Does 2-5 used force, raised and pointed firearms at the plaintiffs, and ordered them into the gas station under threat of force.

227. John Does 6-10 observed improper use of force at the gas station and failed to intervene.

228. The defendants' actions violated constitutional rights that were clearly established on May 30, 2020.

229. The defendants acted with evil intent or reckless indifference to the plaintiffs' rights.

230. The defendants subjected the plaintiffs to deprivations of their rights in such a manner as to render the defendants liable for punitive damages.

231. As direct and proximate result of the acts of the defendants, the plaintiffs suffered injuries and other harms that entitle them to damages.

232. The manner in which the defendants deprived the plaintiffs of their rights supports an award of punitive damages, which are necessary to deter further improper conduct.

233. The plaintiffs are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## Count 2 – 42 U.S.C. § 1983 – First Amendment Violations of Free Speech and Assembly

234. The plaintiffs reallege all allegations of this Complaint as if fully stated herein.

235. The defendants, under color of state law, retaliated against the plaintiffs for engaging in constitutionally-protected activity.

236. The defendants acted under color of state law while performing the acts described herein.

237. The defendants deprived the plaintiffs' First and Fourteenth Amendment rights through the actions described herein.

238. The defendant officers engaged in a pattern of force against civilians with the purpose of intimidating and punishing them for exercising their First Amendment rights.

239. Officers used force to retaliate against the plaintiffs' right to assemble with journalists.

240. The defendants' actions violated constitutional rights that were clearly established on May 30, 2020.

31

241.    The defendants' conduct chilled citizens from continuing to engage in constitutionally-protected activities.

242.    The defendants acted with evil intent or reckless indifference to the plaintiffs' rights.

243.    The defendants subjected the plaintiffs to deprivations of their rights in such a manner as to render them liable for punitive damages.

244.    As direct and proximate result of the acts of the defendants, the plaintiffs suffered injuries and other harms that entitle them to damages.

245.    The manner in which the defendants deprived the plaintiffs of their rights supports an award of punitive damages, which are necessary to deter further improper conduct.

246.    The plaintiffs are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count 3 – 42 U.S.C. § 1983 – Fourteenth Amendment Violations of Due Process

247.    The plaintiffs reallege all allegations of this Complaint as if fully stated herein.

248.    The defendants acted under color of state law while performing the acts described herein.

249.    The defendants deprived the plaintiffs of their Fourteenth Amendment Due Process rights through the actions described herein.

250. The defendant officers engaged in conduct that shocked the conscience when they engaged in an operation to hunt and use improper force toward civilians that included the plaintiffs. Officers engaged in operations that were detrimental to legitimate law enforcement purposes and created safety risks to civilians and officers. Officers caused numerous and severe injuries to civilians, including the plaintiffs. The conduct was particularly shocking because it occurred in the context of protests against police brutality and racism.

251. The defendants' actions violated constitutional rights that were clearly established on May 30, 2020.

252. The defendants acted with evil intent or reckless indifference to the plaintiffs' rights.

253. The defendants subjected the plaintiffs' to these deprivations of rights in such a manner as to render the defendants liable for punitive damages.

254. As direct and proximate result of the acts of the defendants, the plaintiffs suffered injuries and other harms that entitle them to damages.

255. The manner in which the defendants deprived the plaintiffs of their rights supports an award of punitive damages, which are necessary to deter further improper conduct.

256. The plaintiffs are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## Count 4 – 42 U.S.C. § 1983 – Fourteenth Amendment Violation
## of Equal Protection Clause

257.    The plaintiffs reallege all allegations of this Complaint as if fully stated herein.

258.    The plaintiffs include non-white and Black individuals.

259.    Officers deprived the plaintiffs of their Equal Protection Clause rights due to the actions described herein.

260.    The MPD was found to target and use force against non-white individuals due to their race.

261.    MPD officers targeted the plaintiffs and others because they comprised of expressed support for non-white persons' rights.

262.    Mercil encouraged Osbeck to target non-white individuals due to racial animus.

263.    Officers falsely accused the plaintiffs and other non-white individuals of engaging in looting and rioting despite the absence of evidence supporting those allegations.

264.    The defendant officers engaged in a pattern targeting non-white individuals with force based upon false justifications that the non-white individuals were engaged in criminal activity.

265.    The plaintiffs were targeted and shot by officers due to racial animus and discrimination.

34

266. The defendants acted under color of state law while performing the acts described herein.

267. The defendants' actions violated constitutional rights that were clearly established on May 30, 2020.

268. The defendants deprived the plaintiffs of their constitutional rights due to their status as non-white individuals.

269. The defendants acted with evil intent or reckless indifference to the plaintiffs' rights.

270. The defendants subjected the plaintiffs to these deprivations of rights in such a manner as to render the defendants liable for punitive damages.

271. As direct and proximate result of the acts of the defendants, the plaintiffs suffered injuries and other harms that entitle them to damages.

272. The manner in which the defendants deprived the plaintiffs of their rights supports an award of punitive damages, which are necessary to deter further improper conduct.

273. The plaintiffs are entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count 5 – 42 U.S.C. § 1983 – Supervisory Liability

274. The plaintiffs reallege all allegations of this Complaint as if fully stated herein.

275.   At all material times, the defendants Mercil, Severance, and Bittell had supervisory responsibilities over officers who deprived the plaintiffs of their constitutional rights.

276.   These defendants had actual knowledge that officers were violating constitutional rights of civilians, including those of the plaintiffs.

277.   These defendants also had actual knowledge that officers were failing to accurately report conduct that deprived persons, including the plaintiffs, of their constitutional rights.

278.   These defendants acted under color of state law and with deliberate indifference to, authorized, or acquiesced in the violations of the plaintiffs' constitutional rights by other officers.

279.   These defendants acted with evil intent or reckless indifference to the plaintiffs' rights.

280.   These defendants subjected the plaintiffs to these deprivations of their rights in such a manner as to render them liable for punitive damages.

281.   As direct and proximate result of the acts of these defendants, the plaintiffs suffered injuries and other harms that entitle them to damages.

282.   The manner in which these defendants deprived the plaintiffs of their rights supports an award of punitive damages, which are necessary to deter further improper conduct.

283.   The plaintiffs are entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## Count 6 – *Monell* Civil Rights Violation

284.   The plaintiffs reallege all allegations of this Complaint as if fully stated herein.

285.   Before officers encountered the plaintiffs, the City of Minneapolis and the MPD had continuing, widespread, and persistent customs of unconstitutional misconduct by officers.

286.   The customs have been described herein. They include excessive use of force with crowd-control and less-lethal weaponry, excessive use of force during encounters, improper targeting and use of force against non-white individuals, and failure to report, investigate, and punish constitutional violations by officers.

287.   The City of Minneapolis had notice that these customs existed through widely-reported patterns and specific violations by its officers.

288.   Supervisors and officers participated in and witnessed numerous examples of these customs before and surrounding the incident with the plaintiffs.

289.   The City of Minneapolis engaged in deliberate indifference to or tacit authorization of such conduct by officers after having notice of misconduct.

290.   The City of Minneapolis failed to supervise or train officers adequately to prevent the constitutional violations described herein.

291.   Policymaking officials of the City of Minneapolis undertook actions with deliberate indifference that caused violations of the plaintiffs' constitutional rights.

292.    The City of Minneapolis had policies that permitted unconstitutional use of force by officers, including permitting use of force to prevent or in response to property damage, even when there was no safety threat.

293.    The plaintiffs were injured by officers' actions pursuant to these improper customs. The MPD's failure to adequately train and supervise officers contributed to the plaintiffs' injuries. The MPD's unconstitutional policies authorized and encouraged officers to violate the plaintiffs' constitutional rights.

294.    As direct and proximate result of the acts of the defendant, the plaintiffs suffered injuries and other harms that entitle them to damages.

295.    The plaintiffs are entitled to fully recover their costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiffs pray for judgment as follows:

1.    That the Court find that the defendants committed acts and omissions violating the First, Fourth, and Fourteenth Amendments to the United States Constitution permitting a cause of action under 42 U.S.C. § 1983;

2.    As to Counts 1-5, a money judgment against the officer defendants for compensatory and punitive damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.    As to Count 6, a money judgment against the defendant City of Minneapolis for compensatory damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

38

4.      For an order mandating changes in policies and procedures of the MPD to prevent further violations of constitutionally-protected rights as stated herein;

5.      For such other and further relief as this Court may deem just and equitable.

## JURY DEMAND

The plaintiffs demand a trial by jury on all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Date: September 20, 2023

**LAW OFFICE OF ERIC A. RICE, LLC**

*/s/Eric Rice*
Eric A. Rice (MN #0388861)
1 W. Water St., Ste. 275
St. Paul, MN 55107
P: (651) 998-9660
F: (651) 344-0763
eric@ricedefense.com

*Attorney for Plaintiffs*